UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SANTANA RADFORD,

       Plaintiff,

v.                          Civil Action No. 2:14-24854

C.O. DALE HAMMONS,
individually and in his official
capacity as a correctional officer
of the West Virginia Regional Jail and
Correctional Facility and Authority,
and LT. LARRY BUNTING,
Chief Correctional Officer; individually
and in his official capacity,
and THE WEST VIRGINIA REGIONAL JAIL
AND CORRECTIONAL FACILITY AUTHORITY,
an agency of the State of West Virginia,
and JOHN DOE,
unknown person or persons,

       Defendants.

MEMORANDUM OPINION & ORDER

Pending are three motions to dismiss: two filed by
Dale Hammons, on August 26, 2014 and November 17, 2014,
respectively; and a third, filed by the West Virginia Regional
Jail and Correctional Facility Authority (the "Authority") on
September 9, 2014.

I. Background

A.

The plaintiff, Santana Radford, alleges that, while incarcerated at the Southern Regional Jail ("Jail"), she was sexually harassed, abused, and exploited by Hammons, a corrections officer; she also claims that neither the Authority nor Hammons' supervisor, Lieutenant Larry Bunting, intervened to prevent her abuse.

Radford asserts that Hammons "sexually harassed her[,] . . . made sexually exploitive comments to her," "made remarks . . . seeking sexual favors and engaged in acts of sexual abuse visited upon her." Am. Compl. ¶ 2. Specifically, she alleges that Hammons was assigned to supervise her and used his "position of authority . . . to coerce sexual favors from her"; made sexually suggestive comments about her posterior; abused her by touching her vaginal area; and masturbated "in very close proximity" to her. Id. As a result, Radford suffered anxiety, humiliation, annoyance, inconvenience, pain, suffering, mental anguish, diminished joy, physical injury, and expects to incur future medical and pharmaceutical expenses. Am. Compl. ¶¶ 25(a)-(f).

2

According to the complaint, Bunting was responsible for the supervision of Jail operations and the assignment of Jail personnel, including Hammons.  Am. Compl. ¶ 2.  Radford asserts that "a continuing pattern and practice of sexual harassment, sexual abuse and sexual assault [] upon women [by] correctional staff" existed at the Jail from the time of its opening, but Bunting "failed to supervise, discipline, deter and [] recommend discharge of sexually abusive staff members . . . including Hammons[.]"  Am. Compl. ¶ 4.  She maintains that Bunting "willfully and frequently ignored incident reports, investigative reports, and female inmates' allegations of staff sexual abuse," despite being generally "aware of facts from which the inference could be drawn that a substantial risk of harm to [Radford] existed[;]" and "willfully failed to supervise, discipline,[ and] deter . . . sexually abusive staff members [], including defendant Hammons and many other correctional officers."  Am. Compl. ¶ 4.

Specifically, she claims that Bunting became aware of allegations that Hammons had abused another inmate, A.B., after a third inmate reported A.B.'s abuse to a sergeant at the Jail.  Am. Compl. ¶ 4.  But Bunting, who was a personal friend of Hammons', "never once appropriately investigated" that allegation, continued to assign Hammons to supervise female

3

inmates, and failed to report the abuse allegation concerning A.B. to law enforcement.  <u>Id.</u>  Bunting was also "fully aware that some security cameras within [the Jail] were inoperative," that "others were not being monitored," and that "additional cameras should have been placed in areas . . . where correctional officers sexually abused" inmates.  <u>Id.</u>

Radford also claims that John Doe -- identified as one or more unknown Authority employees -- "conspired with, aided and abetted, acted as a lookout, engaged in acts of reprisal against [her], served as an accessory before and after the fact and acted as a principle [*sic*] with regard to the misconduct of defendant Hammons."  Am. Compl. ¶¶ 5, 6.  Doe was also "deliberately indifferent" to the threat posed by Hammons, "concealed the actions of Hammons, [] facilitated [Radford's] exploitation[, ] engaged in retaliation against [Radford,] or assigned Hammons to be alone with and supervise [Radford.]"  <u>Id.</u>

Finally, the plaintiff alleges that neither Hammons nor Bunting was "subjected to pre-hiring psychological testing, as required by law[.]"  Am. Compl. ¶ 11.

### B.

Radford filed her initial complaint in the Circuit Court of Kanawha County on April 7, 2014, charging the

defendants with committing a number of torts, and violating

rights protected by the constitutions of the United States and

the State of West Virginia.  The Authority removed the case on

August 19, 2014, invoking this court's federal-question

jurisdiction over Radford's federal constitutional claims.[1]

---

[1] There were two irregularities in the removal process, neither
of which is fatal to the court's jurisdiction.  First, neither
Hammons nor Bunting joined in the removal, because neither had
been served in state court when the Authority filed its notice
of removal.  Hammons subsequently filed a "consent to removal"
on August 21, 2014, and Bunting appeared and filed an answer on
October 30, 2014.  The plaintiff did not, however, move to
remand on the basis of any potential procedural defect within
thirty days of the notice of removal.  28 U.S.C. § 1447(c); In
re Norfolk Southern Ry. Co., 756 F.3d 282, 287 (4th Cir. 2014)
(noting that a motion to remand based on a procedural defect
must be made within thirty days of the notice of removal).
        Second, while the initial complaint included claims
against the individual defendants under 42 U.S.C. § 1983, the
plaintiff specifically stated that "[n]o claims [we]re asserted
against the [Authority] under" that statute.  But the removal
statute, 28 U.S.C. § 1441(a), allows the removal of "any civil
action brought in a State court of which" the district court
would "have original jurisdiction," and the court has original
jurisdiction over Radford's § 1983 claims against Hammons and
Bunting, and supplemental jurisdiction over the state-law claims
against all defendants, see 28 U.S.C. § 1367(a) (providing that
"supplemental jurisdiction shall include claims that involve the
joinder or intervention of additional parties"); see also Exxon
Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 558 (2005)
("The last sentence of § 1367(a) makes it clear that the grant
of supplemental jurisdiction extends to claims involving joinder
or intervention of additional parties."); id. at 556-58
(explaining the history of the Supreme Court's supplemental
jurisdiction jurisprudence, noting that § 1367(a) was adopted in
response to the Court's earlier holding in Finley v. United
States, 490 U.S. 545 (1989), that courts did not have discretion
to exercise pendent party jurisdiction absent an affirmative
grant from Congress, and stating that § 1367 "overrule[d]
Finley").

Hammons and the Authority filed motions to dismiss shortly thereafter, on August 26 and September 9, 2014, respectively.

Radford moved for leave to amend her complaint, also on September 9, 2014.  The court granted Radford's request on November 12, 2014, construed the pending motions to dismiss as though lodged against the amended complaint, and invited supplemental briefing.

The amended complaint contains the following causes of action: claims against Hammons, Bunting, and John Doe for violating Radford's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution[2] (Count I), Am. Compl. ¶¶ 13-17; claims against Hammons, Bunting, and the Authority for intentional infliction of emotional distress (Count II), Am. Compl. ¶¶ 18-21; claims against Hammons for sexual harassment, battery, assault, intentional infliction of emotional distress (again), and negligent infliction of emotional distress (Count III), Am. Compl. ¶¶ 22-23(a)-(e); claims against Hammons, Bunting, and "other staff" of the Authority for conspiring to deprive the plaintiff of various,

---

[2] The complaint does not say so, but the court construes these as claims under 42 U.S.C. § 1983.  Johnson v. City of Shelby, 135 S. Ct. 346, 347 (2014) (per curiam) ("In particular, no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim.").

but unspecified, state and federal rights (Count V),[3] Am. Compl. ¶¶ 26-28; and, though not enumerated as a "Count" per se, claims against the Authority "arising from negligent retention of defendants Hammons and Bunting[,] its negligent failure to intervene on plaintiff's behalf[, and] its negligent supervision of defendant Hammons" (for convenience, "Count VI"), see Am. Compl. ¶ 6.   Radford reaffirms that "[n]o claims are asserted against the [Authority] under 42 U.S.C. § 1983," Am. Compl. ¶ 28, and notes that the "relief sought is limited to coverage afforded by applicable liability insurance policies," Am. Compl. ¶ 1.[4]

As noted, Hammons filed his initial "motion for partial dismissal" on August 26, 2014.  In it, he asserted that the complaint was supported by no more than threadbare recitals

---

[3] "Count IV" of the complaint is a recitation of the damages suffered by the plaintiff, and asserts no cause of action.

[4] In West Virginia, "[s]uits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State" found in Section 35 of Article VI of the West Virginia Constitution.  Syl. Pt. 2, Pittsburgh Elevator v. W. Va. Bd. of Regents, 310 S.E.2d 675, 676 (W. Va. 1983).  The Authority does not dispute the existence of an applicable insurance policy.
    The Authority has also not raised the Eleventh Amendment as a bar to this court's exercise of jurisdiction. But to the extent an applicable insurance policy renders the State susceptible to the plaintiff's claims in its own courts, the Authority's decision to remove this case likely waived that argument.  See Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 618-24 (2002).

that were not sufficient to state a claim under the standard
announced in Iqbal and Twombly, argued that he could not be held
liable under § 1983 for any claims asserted against him in his
official capacity, and claimed that the plaintiff could maintain
no action for money damages based on violations of the West
Virginia constitution.  He filed a second motion on November 17,
2014, reiterating his argument that he cannot be held liable in
his official capacity under § 1983.  In response, on December 9,
2014, the plaintiff submitted a stipulation of dismissal, signed
by her counsel and counsel for Hammons, agreeing to dismiss with
prejudice "all official capacity claims" alleged against
Hammons.

        The Authority's initial motion, filed September 9,
2014, argued that the Authority could not be held vicariously
liable for any misconduct on the part of Hammons, Bunting, or
Doe.  Its supplemental memorandum, filed November 21, 2014, and
its supplemental reply, filed December 5, 2014, further develop
that argument.

## II. Standard of Review

        Under Federal Rule of Civil Procedure 8(a)(2), the
complaint must contain "a short and plain statement of the claim

8

showing that the pleader is entitled to relief."  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).  Facial plausibility exists when the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556).

In assessing plausibility, the court must accept as true the factual allegations contained in the complaint, but not

9

the legal conclusions.  Id.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.

### III. Discussion

#### A. Claims against Hammons

In his initial motion to dismiss, Hammons argued that any § 1983 claims against him in his official capacity must be dismissed, that any claims for money damages under the State constitution must be dismissed, and that the complaint as a whole did not plead sufficient facts to state a claim that was plausible on its face.

His first two objections have been rendered moot by subsequent events.  The plaintiff has voluntarily stipulated to the dismissal of any official capacity § 1983 claims, and the amended complaint includes no claim for money damages arising under the State constitution.  The factual plausibility of each remaining claim is addressed below.

#### 1. Count I

Under § 1983, a "'plaintiff must allege the violation of a right secured by the Constitution and laws of the United

States, and must show that the alleged deprivation was committed by a person acting under color of state law.'" <u>Crosby v. City of Gastonia</u>, 635 F.3d 634, 639 (4th Cir. 2011) (quoting <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988)).  In Count I, Radford alleges that Hammons violated her Fifth, Eighth, and Fourteenth Amendment rights.

"The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments on those convicted of crimes." <u>Wilson v. Seiter</u>, 501 U.S. 294, 296-97 (1991) (internal quotation marks and citation omitted). Sexual abuse of an inmate by a prison guard meets that standard. <u>Woodford v. Ngo</u>, 548 U.S. 81, 118 (2006) (Stevens, J., dissenting on other grounds) ("[I]nmates who are sexually assaulted by guards . . . have suffered grave deprivations of their Eighth Amendment rights."); <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994) ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." (internal quotation marks omitted)); <u>Schwenk v. Hartford</u>, 204 F.3d 1187, 1197 (9th Cir. 2000) ("A sexual assault on an inmate by a guard . . . is deeply offensive to human dignity." (internal quotation marks and citation omitted)).

11

Here, Radford alleges that Hammons used his position of authority to coerce sexual favors from her, abused her by touching her vaginal area, and masturbated "in very close proximity" to her.  These allegations are sufficient to state a plausible Eighth Amendment violation.  Schwenk, 204 F.3d at 1196-98 (holding that an inmate-plaintiff stated an Eighth Amendment claim by alleging that a guard repeatedly requested oral sex, groped the inmate's buttocks, and pressed his penis against the plaintiff's clothed body); Wood v. Beauclair, 692 F.3d 1041, 1049-51 (9th Cir. 2012) (holding that allegations that prison guard touched inmate's penis for her own gratification were sufficient to state an Eighth Amendment claim); see also Hager v. Robinson, No. 2:03-0094, slip op. at 33-40 (S.D. W. Va. Feb. 1, 2005) (Copenhaver, J.) (holding, in a case involving allegations of sexual abuse by a prison guard against an inmate, that testimony of "a pattern of abuse that includes at least two instances of sexual penetration as well as additional instances of fondling and exposure, . . . if accepted as true by the trier of fact," could suffice to show an Eighth Amendment violation).

As for her remaining theories of liability, the Fifth Amendment applies to the conduct of federal, rather than state, officers, Bartkus v. Illinois, 359 U.S. 121, 124 (1959), and so

12

is inapplicable here, <u>Massey v. Ojaniit</u>, 759 F.3d 343, 354 n.8 (4th Cir. 2014).  And the substantive due process clause of the Fourteenth Amendment provides prisoners with "no greater protection than does the Cruel and Unusual Punishments Clause," <u>Whitley v. Albers</u>, 475 U.S. 312, 327-28 (1986), rendering Radford's claim on that basis, "at best redundant" of her claim founded on the Eighth Amendment, <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989).

## 2. Count II

To state a claim for intentional infliction of emotional distress, a plaintiff must allege:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

<u>Travis v. Alcon Labs., Inc.</u>, 504 S.E.2d 419, 425 (W. Va. 1998). "Whether the alleged conduct may be reasonably considered outrageous is a threshold question for the court"; whether the conduct "is in fact outrageous is a question for the jury." <u>Gilco v. Logan Cnty. Commission</u>, No. 11-32, 2012 WL 3580056, at

*5 (S.D. W. Va. Aug. 17, 2012) (Copenhaver, J.) (citing Syl. Pt. 3 & Pt. 4, Alcon Labs, 504 S.E.2d at 419).

Radford alleges that Hammons coerced her into performing sexual favors, touched her inappropriately, and made obscene comments and gestures towards her.  Unsurprisingly, she also claims to have suffered anxiety, humiliation, and mental anguish.  Those allegations suffice to state a claim for intentional infliction of emotional distress.  See Gilco, 2012 WL 3580056 at *5 (holding that claims that home confinement officer coerced detainee into performing sexual acts were sufficient to survive a motion for summary judgment on claim of intentional infliction of emotional distress); Hager, slip op. at 44-45 ("[T]he court concludes that a reasonable person may consider severe and repetitive sexual harassment of an inmate by a correctional officer as plainly 'outrageous' for purposes of establishing . . . intentional infliction of emotional distress.").

### 3. Count III

Count III pleads claims for sexual harassment, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress.

14

The intentional infliction of emotional distress claim, as discussed above, is adequately alleged.  The assault and battery claims are also well-pled.  "[A]ssault occurs when one person puts another in reasonable fear or apprehension of an imminent battery and battery is any harmful or offensive contact."  Hutchinson v. W. Va. State Police, 731 F. Supp. 2d 521, 547 (S.D. W. Va. 2010) (citing W. Va. Fire & Cas. Co. v. Stanley, 602 S.E.2d 483, 494-95 (W. Va. 2004)).  Accepting the factual allegations in the complaint as true, Hammons sexually abused Radford and used his position of authority to coerce sexual favors from her.  That conduct suffices to plead claims for assault and battery.  See Stanley, 602 S.E.2d at 494-95 (noting, in an insurance coverage dispute, that allegations of intentional sexual abuse conform to the elements of claims for assault and battery); Criss v. Criss, 356 S.E.2d 620, 621-22 (W. Va. 1987) (testimony that plaintiff was raped by defendant was "sufficient evidence of an assault and battery" to constitute a "proper case for jury determination"); see also Hager, slip op. at 43 ("[The plaintiff] testified that she was sexually assaulted on two occasions by [the corrections officer] -- testimony clearly sufficient to establish a civil claim for assault and battery.").

15

On the other hand, nothing in the complaint suggests that Hammons' abuse of the plaintiff was negligent, and West Virginia does not appear to recognize an independent tort of "sexual harassment" distinct from assault or battery.  Contra Kalany v. Campbell, 640 S.E.2d 113, 118-19 (W. Va. 2006) (discussing a common law claim for retaliatory discharge based on sexual harassment); see also Waffle House, Inc. v. Williams, 313 S.W.3d 796, 803-04 (Tex. 2010) (clarifying that a "common-law claim for sexual harassment does not exist under Texas law," but noting that offensive touching and "[t]aking indecent liberties with a person is of course a battery").  As a result, the negligent infliction of emotional distress and sexual harassment claims are dismissed.

### 4. Count V

Count V asserts that Hammons, Bunting, and other Jail staff conspired to deprive Radford of, among others, her federal constitutional rights.  "To establish a civil conspiracy under § 1983, [a plaintiff] must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right."  Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).

Radford alleges that Hammons sexually abused her, that Bunting and Hammons were friends, and that Bunting knew of Hammons' abuse of inmates but ignored those allegations and continued to assign Hammons to supervise female inmates.  At the motion to dismiss stage, having concluded that Radford has already pled a plausible deprivation of her Eighth Amendment rights, those allegations suffice to state a claim for civil conspiracy under § 1983.


B. Claims against the Authority


Radford initially charged the Authority with intentional infliction of emotional distress (Count II) and negligent retention and supervision ("Count VI"), but she has since "withdraw[n] . . . her claim against the [Authority for] the tort of intentional infliction of emotional distress." Pl.'s Supp. Resp. at 1.

The remaining claim, as noted, is asserted directly against the Authority.  The agency urges that dismissal is appropriate because it cannot be held vicariously liable for Bunting's conduct.[5]

---

[5] The Authority also maintains that it cannot be held vicariously liable for John Doe's conduct because the allegations against Doe are too conclusory to state a claim under the pleading standard announced in Iqbal and Twombly.  Authority's Supp. Mem.

17

1.

Ordinarily, the Authority's arguments would largely be beside the point.  The torts of negligent retention and supervision are distinct from the theory of an employer's vicarious liability for an employee's torts.  Both share the common element of a tort committed by an employee, but the similarity between the two ends there.

Under the doctrine of respondeat superior, an employer can be held vicariously liable for the tortious acts of its employee committed within the scope of employment.  The doctrine provides a theoretical basis for imputing the liability of the employee to his employer; no independent wrong-doing on the part of the employer is required.  <u>See</u> 65 C.J.S. Negligence § 150 ("'Direct liability'" is liability for the breach of one's own duty of care, while 'vicarious liability' is indirect legal responsibility and is liability for the breach of another's duty of care; one person, although entirely innocent of any wrongdoing and without regard to duty, is nonetheless held responsible for the harm caused by the wrongful act of another." (footnotes omitted)); <u>see also</u> Syl. Pt. 3, <u>Musgrove v. Hickory</u>

at 9.  In <u>Farmer v. Wilson</u>, No. 14-13256, 2014 WL 4629591 (S.D. W. Va. Sept. 15, 2014) (Copenhaver, J.), this court dismissed claims against a Doe defendant based on materially identical pleadings.  <u>Id.</u> at *2-3.  Accordingly, it is ordered that the claims against John Doe be, and hereby are, dismissed without prejudice.

Inn, Inc., 281 S.E.2d 499 (W. Va. 1981) ("An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable.").

A negligent retention or supervision claim, on the other hand, focuses on the entirely distinct question of an employer's culpability for retaining or failing to adequately supervise an employee whom the employer knew, or should have known, posed a risk to third parties.  If the employee later commits a tort, the employer may be directly liable.  As with negligence torts more generally, the analysis centers on whether the employer was on notice of the employee's propensity (creating a duty), yet unreasonably failed to take action (manifesting a breach), resulting in harm to a third-party from the employee's tortious conduct.  See 30 C.J.S. Employer—Employee § 205 ("It is necessary to show that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, having this knowledge, failed to supervise the employee adequately, or take other action to prevent the harm." (footnotes omitted)); see also Woods v. Town of Danville, W.V., 712 F. Supp. 2d 502, 514-

15 (S.D. W. Va. 2010) (negligent supervision) ("Under West Virginia law, negligent supervision claims must rest upon a showing that [the Town of] Danville failed to properly supervise Jarrett and, as a result, Jarrett proximately caused injury to the plaintiffs." (citing <u>Taylor v. Cabell Huntington Hosp., Inc.</u>, 538 S.E.2d 719, 725 (W. Va. 2000)); <u>McCormick v. W. Va. Dep't of Public Safety</u>, 503 S.E.2d 502, 507 (W. Va. 1998) (per curiam) (negligent hiring/retention) ("[W]hen the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?").

Several courts, including this one, have observed the distinction. <u>Hager</u>, slip op. at 30-33 (holding, in a factually analogous case, that an inmate's claim for negligent retention against the Authority survived summary judgment without addressing the plaintiff's separate theory of vicarious liability); <u>Krein v. W. Va. State Police</u>, No. 11-962, 2013 WL 2588089, at *7-8 (S.D. W. Va. June 11, 2013) (analyzing a claim against the State Police for negligent hiring/retention/supervis

-ion in addition to a separate theory of vicarious liability); Interim Pers. of Cent. Va., Inc. v. Messer, 559 S.E.2d 704, 707 (Va. 2002) ("The tort of negligent hiring is distinct from tort liability predicated upon the doctrine of respondeat superior; the two theories differ in focus. Under the latter, an employer is vicariously liable for an employee's acts committed within the scope of employment. In contrast, the tort of negligent hiring is a doctrine of primary liability; the employer is principally liable for placing an unfit individual in an employment situation that involves an unreasonable risk of harm to others. Negligent hiring enables a plaintiff to recover in circumstances when respondeat superior's 'scope of employment' limitation protects employers from liability."); see also 30 C.J.S. Employer—Employee § 204 ("Like negligent hiring, negligent retention is based on the employer's act or omission, and not on respondeat superior, but the employee's underlying tort is also an essential element." (footnotes omitted)); Restatement (Second) of Agency § 213 cmt. d ("Liability results under the rule stated in this Section, not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment.").

And the difference between the theories appears,
albeit less explicitly, in West Virginia cases, as well. See
Pruitt v. W. Va. Dep't of Public Safety, 664 S.E.2d 175, 182 (W.
Va. 2008) (separately analyzing a "failure to instruct and/or
supervise claim" and a theory of vicarious liability in a tort
case arising out of a fatal shooting by a State Trooper); Boggs
v. Camden-Clark Mem'l Hosp. Corp., 609 S.E.2d 917, 920 (W. Va.
2004) (noting that the plaintiff pled separate "theories of
negligent hiring and retention, as well as vicarious
liability").

      If the same distinction applied here, the Authority's
liability for negligently retaining or supervising Hammons would
not turn on the theory of vicarious liability, but on the
answers to relatively straight-forward questions:  Did the
Authority know, or should it have known, that Hammons posed a
risk to inmate safety but fail to fire him or properly supervise
him?  Indeed, applying that standard in Hager, this court
concluded that a factually analogous negligent retention or
supervision claim survived summary judgment without passing on
the question of vicarious liability:

      [The inmate] has produced evidence that, prior to her
      claims of sexual abuse and harassment at the hands of
      [the corrections officer], certain officials of the
      Southwestern Regional Jail conducted an inconclusive
      investigation of [the corrections officer] concerning
      abuse allegations of another inmate[.] . . . [The

22

inmate] and her co-plaintiffs have further produced evidence that [the corrections officer] was suspended for unrelated conduct deemed to be in violation of the Authority's policy on sexual harassment. Construing this evidence most favorably to [the inmate], a reasonable person may conclude that [the corrections officer] posed a threat to the female inmates housed at the Southwestern Regional Jail and that the Authority knew or should have known about his threat prior to the incidents forming the basis for this action. Whether the Authority was negligent in retaining [the correction officer's] services subsequent to these events or was negligent in failing to provide adequate supervision of [his] duties at least as those duties pertained to guarding female inmates remains a genuine issue of material fact in dispute.

Hager, slip op. at 32-33.

However, based on a recent decision of the West Virginia Supreme Court of Appeals, it appears that the Authority's sole focus on the question of vicarious liability is appropriate. In West Virginia Regional Jail & Correctional Facility Authority v. A.B., 766 S.E.2d 751 (W. Va. 2014), the Supreme Court of Appeals considered a negligent training/supervi -sion/retention claim against the Authority arising, as in this case, out of the alleged sexual abuse of an inmate by a corrections officer. The court "beg[a]n by observing that it [wa]s of no consequence . . . that the parties characterize[d] th[e claim] as a 'direct' claim against the [Authority.]" Id. at 772. Instead, it concluded that the claim was "based on vicarious liability," because no "general duty was statutorily

23

or otherwise imposed upon the State," and "the negligence alleged in the complaint [could] be traced to a particular individual(s)." Id.; see also id. at 773 ("[W]e disagree with respondent that this Court has previously held that negligent hiring, supervision, and retention claims are per se viable causes of action against the State or its agencies.").

"Having clarified" that "[t]he training, supervision, and retention of [the offending corrections officer] unquestionably fell to some public officer(s) or employee(s) from whose alleged negligence the [inmate's] claim derives," A.B., 766 S.E.2d at 772, the court then explained that the Authority, as a State agency, could only be vicariously liable if: (1) any negligence with respect to training, supervision, or retention was committed within the scope of an Authority employee's employment; and (2) the negligence "violated a 'clearly established' right or law with respect to [] training, supervision, or retention," see id. at 773-74; see also id. at 765 ("[W]e believe that situations wherein State actors violate clearly established rights while acting within the scope of their authority and/or employment [] are reasonably borne by the State.").

Under that rubric, the Authority maintains that Radford's negligent retention and supervision claims fail at the

24

first step, because Bunting was acting outside the scope of his employment.

2.

"[W]hether an agent is acting within the scope of his employment and about his employer's business . . . is <u>generally</u> a question of fact for the jury," but may be decided by the court as a matter of law when the facts are undisputed and "the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not reasonably conclude that the act was within the scope of employment." <u>Id.</u> at 768 (internal citations and quotation marks omitted, emphasis in the original). As the supreme court of appeals has previously explained:

> [I]t may be said that an act is within the course of employment, if: (1) It is something fairly and naturally incident to the business and (2) it is done while the servant was engaged upon the master's business and is done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent and personal motive on the part of the servant to do the act upon his own account.

<u>Foodland v. W. Va. Dep't of Health & Human Res.</u>, 532 S.E.2d 661, 665 (W. Va. 2000) (quotation marks and citation omitted); <u>see also A.B.</u>, 766 S.E.2d at 768-70 (collecting cases).

25

The court in <u>A.B.</u> had no occasion to decide, but seemed to assume, that simple negligence with respect to training, supervision, or retention would fall within a supervisory employee's scope of employment.  See <u>A.B.</u>, 766 S.E.2d at 774 n.29 (noting that the Authority did not argue "that any such alleged negligence" would fall outside the scope of employment); <u>see also</u> <u>id.</u> at 772 ("The training, supervision, and retention of D.H. unquestionably fell to some public officer(s) or employee(s), from whose alleged negligence respondent's claim derives.").  On the other hand, the court concluded as a matter of law that the sexual abuse of an inmate falls "manifestly outside the scope of" a corrections officer's employment because it is "in no way an ordinary and natural incident" of a corrections officer's duties and "in no way further[s] the purposes of the [Authority]."  <u>Id.</u> at 768-72.

Proceeding by analogy here, the Authority argues that it cannot be liable for Bunting's conduct because "[a] supervisor who is alleged to be a close friend of the offending correctional officer and essentially acting as an alleged accomplice to [the sexual abuse of an inmate] is acting as far outside the scope of employment as the offending correctional officer."  <u>See</u> Authority's Supp. Mem. at 8-9.  In other words, a supervisor who acts as a co-conspirator is not merely

"negligent" -- he's at that point no supervisor at all, and his conduct is therefore beyond the scope of employment.

The plaintiff does not dispute that characterization of Bunting's conduct,[6] which finds ample support in the amended complaint.  Indeed, as earlier noted, Radford alleges that Bunting "willfully and frequently ignored incident reports, investigative reports, and female inmates' allegations of staff sexual abuse," and "willfully failed to supervise, discipline,[ and] deter . . . sexually abusive staff members [], including defendant Hammons and many other correctional officers."  Am. Compl. ¶ 4.  The amended complaint also claims that Bunting and Hammons were "personal friends"; that Bunting was aware of specific allegations that Hammons had abused a female inmate but did not appropriately investigate the complaint or report the abuse; and that Bunting "protect[ed] Hammons" and "knowingly permit[ted] . . . Hammons to directly supervise female [inmates]," even after an abuse allegation had been lodged against him.  Id.

Even when viewed in the light most favorable to the plaintiff, those allegations indicate that Bunting's conduct

---

[6] Although Radford did not respond to any of the Authority's arguments regarding Bunting, that alone does not relieve the court of its "obligation to review the motion[] to ensure that dismissal is proper."  Stevenson v. City of Seat Pleasant, 743 F.3d 411, 416 n.3 (4th Cir. 2014).

fell well beyond the scope of his employment.  Bunting was
"charged with general supervision of jail operations and general
supervision and assignment of security staff including defendant
Hammons."  Id. ¶ 2.  Instead, by his acts or omissions, he
deliberately concealed the allegedly criminal conduct of his
friend, Hammons, and continued to give Hammons access to female
inmates.  Such conduct was not simply "mistaken or ill-advised."
It could not possibly have been authorized by the Authority, and
cannot be deemed an ordinary or natural incident of Bunting's
employment.  Cf. A.B., 766 S.E.2d at 768-72.

Indeed, treating the allegations in the amended
complaint as true, Bunting did not negligently carry out his
duties; he intentionally and completely repudiated them.  As
alleged, his failure to supervise or discipline Hammons amounted
to a willful and deliberate attempt to conceal the allegedly
criminal conduct of a "personal friend".  The Authority is not
vicariously liable for that conduct.

### IV. Conclusion

For the foregoing reasons, it is ORDERED that Hammons'
motion to dismiss (ECF No. 5) is granted insofar as it seeks
dismissal of Radford's claims for negligent infliction of

28

emotional distress and sexual harassment as distinct from assault and battery, but otherwise denied.  Hammons' additional motion to dismiss (ECF No. 35) is denied as moot.

It is further ORDERED that the Authority's motion to dismiss (ECF No. 10) is granted.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

DATED: February 20, 2015

John T. Copenhaver, Jr.
United States District Judge